Filed 9/23/25  P. v. Maravilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LUIS ALBERTO MARAVILLA,<br><br>    Defendant and Appellant. | F087259<br><br>(Super. Ct. No. MCR061110)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Sosi C. Vogt, Judge.

Elizabeth Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant and appellant Luis Alberto Maravilla got into an argument with his wife, Mayra Aragon Lara (Aragon), and squeezed her neck.  Aragon called 911 and

police were dispatched to their residence.  Maravilla told his wife that he was going to shoot the police and save a bullet for her.  When the police arrived, he opened fire for several hours, shooting several rounds at law enforcement, hitting one officer in the leg.

A jury convicted Maravilla of attempted murder of a peace officer, attempted voluntary manslaughter of Aragon, criminal threats, nine counts of assault on a peace officer with a firearm, and one count of shooting at an inhabited dwelling.  Several firearm enhancements were found true.  In a bifurcated proceeding, the court found several aggravating circumstances true.  Maravilla was sentenced to a total determinate term of 105 years eight months and a total indeterminate term of 40 years to life.

On appeal, Maravilla claims the trial court erred by not instructing the jury on imperfect self-defense and that the court applied an incorrect standard under Penal Code section 1385, subdivision (c)(2)[1] in not striking any firearm enhancements.  The People contend there was no substantial evidence to support an imperfect self-defense instruction but concede the court applied an incorrect standard under section 1385 given recent court decisions.  We conclude the trial court did not err when it did not instruct on imperfect self-defense.  However, the court did not apply the correct standard in deciding not to strike enhancements under section 1385, subdivision (c)(2) given recent case law.  Therefore, we vacate the judgment and remand for resentencing.

## FACTUAL BACKGROUND

### Evidence

### Mayra Aragon Lara (Aragon)

Aragon was married to Maravilla for 22 years and they had three children together.  At the time of trial, Aragon and Maravilla were divorced.

On November 11, 2018, Aragon was living with Maravilla in Madera when an incident occurred.  Only the two of them lived there at the time because their children had

---

[1] All statutory references are to the Penal Code.

moved out. Aragon was in her daughter's bedroom, with the door shut and locked, talking to her son on the phone about issues she was having with Maravilla. Maravilla kicked in the door, came into the room, and started arguing with Aragon. He got on the phone, argued with their son, and ended the call. Maravilla then began arguing with Aragon, who told him to calm down and go to sleep. Maravilla grabbed her neck, squeezed it, called her a whore and a bitch, said that she and their children were nothing without him, and said they were worth shit. Aragon said Maravilla squeezed her neck for about three minutes, which hurt and left red marks. She said she was going to call the police and he threatened her. Aragon cried and he let her go.

After Maravilla let go, Aragon called the police. While she was on the phone with police, Maravilla told her that when the police arrived, he would "shoot them up and the last bullet was going to be for [Aragon]." Aragon was afraid she was going to die and relayed what Maravilla said to the police. She remained on the phone with police and went outside but Maravilla followed her. Aragon was outside in front of the little porch when she noticed the police arrive because she saw the black police vehicle, with its lights on top activated. The lights were "red and colors." The police vehicle's headlights were also on. The lights from the vehicle did not affect Aragon's ability to see the officer. The dispatcher told Aragon, "Oh, the police [are] there now" and she walked towards them with Maravilla following her.

Aragon described the officer as wearing his police uniform and looking like a normal police officer. He greeted them and asked Aragon what was going on. He did not verbally say, "I am a police officer." Aragon did not see the officer with a gun. Aragon said Maravilla was standing next to her with a gun at his waist, tucked into his pants. She did not see the gun when she first called police but noticed he had it when they were still inside the house. Maravilla raised his hands as the officer approached, then lowered his right hand, grabbed his gun and fired at the officer. When asked on cross if she noticed Maravilla smiling, Aragon said she did not remember and "really

3.

wasn't paying attention to him." Defense counsel then questioned Aragon about how she had seen Maravilla lower his hands if she was not paying attention to him. Aragon said that response was for another question. But the answer to the question, "What did he do?" is that "He raised his hands. He took the gun out from the right side, and he shot at the officer."

In response to Maravilla, the officer drew his gun and fired. Aragon said the officer did not take out his gun until Maravilla fired at him. Aragon heard two to three shots. The officer fell and Aragon ran to the side of the house because she was afraid Maravilla would kill her. Aragon noticed Maravilla was following her to the side of the house. He said he was sorry and that he did not want to kill her. He took the magazine out and threw the gun and magazine on the ground. The officer shot at Maravilla as he was following Aragon and the bullet went right by the kitchen, leaving a hole. Aragon explained it happened fast but that Maravilla shot first and the officer fell. She did not see Maravilla point a gun at her and did not see if he fired shots in her direction.

Aragon was still on the phone with police dispatch who told her to run to the police vehicles and the police would provide cover. Aragon ran towards the police vehicles and was placed in a patrol vehicle. At that time, there were a lot of police there. When Aragon got in the police vehicle, the police drove her to another location and provided a trailer for her.

The prosecution admitted the 911 call into evidence, along with a transcript of its recording, and played it for the jury.

**Sergeant Eric Pace**

Eric Pace was employed as a patrol sergeant with the Madera County Sheriff's Office when he was called to a domestic violence incident. Pace was informed by dispatch that the incident involved a firearm. Pace was informed that the caller's husband had a gun and was going to shoot whoever showed up. Pace arrived at the

4.

property which had a long driveway.  He parked 50 to 60 feet from the residence due to continuing information that the suspect may still have a gun and shoot whoever showed up.  Pace saw Aragon approach with a phone to her ear and told dispatch he believed he had the right place.

Pace noted there were no street lights but his vehicle's headlights were on and illuminated the residence.  Pace did not believe his emergency red and blue lights were on and his siren was not activated.  He did not verbally identify himself as a police officer but was wearing a Madera County Sheriff's uniform and was driving a police vehicle.  Pace was pointing a flashlight at the people.  Aragon was talking on the phone; she was not screaming or asking for help.  Pace stated that as Aragon approached him, he saw Maravilla behind her, with his hands up and his palms facing out.  Pace noted Maravilla was smiling.  At that time, Pace was not sure if the threat dispatch reported was serious but still took it seriously.

Pace asked "what is the problem" in Spanish but neither Aragon nor Maravilla responded.  After Pace asked this question, Maravilla moved his hand towards his right hip and immediately began shooting from about 50 to 60 feet away.  Pace drew his own handgun and thought he said, "No, no."  Pace said he did not see the gun until Maravilla pointed it at him.  After Maravilla drew his gun, Pace drew his service weapon.  Pace was then hit by a bullet in the area of his right thigh, above the knee; the bullet passed completely through his leg.  After being shot, Pace fired back at Maravilla.  At that time, Pace aimed at Maravilla trying to hit him, believing Maravilla was trying to kill him.  Pace fired two shots and he believed Maravilla fired six to eight times, emptying his weapon.

Pace ran to take cover.  He could not recall if any more shots were fired after he was hit.  Pace saw Maravilla chasing Aragon, who was running away.  Pace lost sight of them and could not see the gun from his location.  Pace contacted dispatch to let them know he was shot, gave a description of Maravilla, and called for an ambulance.  A

5.

vehicle dash camera recorded the incident; the recording was admitted into evidence and played for the jury. The video shows Aragon on the porch and Maravilla behind her with both hands up initially. As Pace walks towards them, Maravilla lowers his right hand to his right hip. At this point, Pace walks in front of the camera view, blocking Maravilla's next actions. Pace draws his weapon and shots are fired.

### Additional Law Enforcement

Patrol Officer Earl O'Neal was dispatched to the scene and received updates from Pace while en route. Pace described contacting a man and a woman, that the man had his hands in his pocket or pants, and then he reported that he was shot. Pace reported he was shot less than 30 seconds after he reported the man having his hands in his pants. O'Neal arrived with lights and sirens activated on his police vehicle. He used his vehicle to shield Pace in order to triage the wound. O'Neal described their position as being in an open field without cover or concealment. There were obstacles between his position and the house which made it difficult to see if anyone was near the house. O'Neal used his vehicle's PA system to announce the presence of the sheriff's department and told Maravilla to come out with his hands up.

Marcos Plascencia was on street patrol for the Madera County Sheriff's Office and was dispatched to the incident. He thought he turned off his siren as he approached but left on his overhead flashing lights. Plascencia was EMT-certified and provided medical aid to Pace until Pace was transported by ambulance away from the scene. Plascencia and O'Neal stated they did not hear any gunfire during this time.

O'Neal and Plascencia became concerned about the woman involved in the domestic violence incident and saw her outside near the residence. Plascencia signaled to Aragon by pointing his flashlight at her, then waving at her to come towards him. Aragon came over and he put her in the back of his police vehicle. Plascencia tried to get information from Aragon to see if she was okay and asked about Maravilla's location, but she was shaking and quiet, and did not respond.

6.

O'Neal started coordinating with the multiple different law enforcement agencies coming to the scene to set up a perimeter. Shortly after, he heard four or five gunshots. O'Neal took cover behind his passenger side door and announced over the radio that shots were fired. More law enforcement began arriving and then four to five more shots were fired. It sounded like the shots were coming from around the residence. O'Neal stated that the first set of shots sounded like they came from a small caliber weapon, and the second set sounded like they came from the same location but from a more powerful weapon with a larger caliber. O'Neal believed the shots were being fired in his direction based on the whizzing sound of the bullets which meant they were close enough to hear.

Plascencia also heard about four to five shots coming from the residence. Plascencia told Aragon and a civilian rider in the front seat to duck down.

O'Neal heard a lot more gunshots fired in groups, consistently every few minutes "for a significant period of time." The shots appeared to be fired towards his location, coming from the residence. O'Neal remained in his position for about 30 minutes. During this time, he did not maintain constant visual surveillance on the residence, due to the gunshots. O'Neal was not able to see anyone at the residence, nor did he see any muzzle flashes.

Plascencia also could not see anyone at the residence, nor did he see any muzzle flashes. Plascencia could hear shots coming from the residence and then heard the whizzing sound of bullets overhead. Plascencia then got Aragon and the civilian rider out of his vehicle and ran them across to an open area and down the block to where other officers were waiting. He placed Aragon into the back of another police vehicle. Plascencia heard another group of gunshots at this point.

Patrol Sergeant Jacob Tallmon responded that when he arrived to the scene, he saw several officers taking cover and heard gunshots as he approached. He provided cover for O'Neal and Plascencia.

7.

John Romo and Lloyd Pratt, Jr. were with California Highway Patrol (CHP) at the time of the incident and responded to the scene, arriving in their own marked patrol vehicles. They recalled arriving with their vehicle's sirens and lights activated. Romo parked in the street and walked closer to the scene on foot. Pratt parked at the entry of the driveway, grabbed an AR15 from his vehicle, took cover behind his vehicle and looked for the shooter. After a few minutes, Romo and Pratt heard gunshots coming from the residence. The shots came in bursts of five to 10 to 15 rounds at a time. Pratt could not see the shooter but opined the shots were coming from inside the residence and at his general direction because of the sound of bullet strikes near him. Pratt estimated he heard 50 to 75 gunshots in 10 to 15 bursts of gunfire, all of which appeared to come from the residence.

Romo estimated he heard about 150 rounds total. Romo stated the shots came in bursts and assumed that Maravilla was using an entire magazine then having to stop and reload. Based on the sound, Romo believed multiple calibers of ammunition were used. Romo heard the sound of bullets whizzing by him and heard bullets ricocheting off of things near him like telephone poles and power lines and patrol cars.

Supervisor Brent Cederquist with the Madera Sheriff's Department reported to the scene with his vehicle's lights and siren activated, which he deactivated upon arrival. He contacted a deputy on the scene and immediately heard a burst of about 10 rounds of gunfire. Cederquist positioned his vehicle closer to the residence and activated his spotlight onto the residence. Cederquist then ran and took cover behind the CHP vehicle. He did not hear any shots during the time it took for him to move his vehicle and take cover. He remained in that location for about 45 minutes to an hour, during which time he heard several gunshots, heard bullets striking the ground and bullets striking metal behind him. Cederquist estimated he heard about 100 shots overall. The shots came in bursts of six to 10 at a time, which sounded like different calibers from different guns, with breaks in between. Shots sounded like they were coming from the residence but he

8.

never saw anyone shooting a firearm from the residence and he never saw a flash. Cederquist described the situation as "pretty stressful." Some of the shots struck the ground 10 to 15 feet from him. Cederquist thought the location of the shooter moved during the time he took cover behind the vehicle.

Tallmon testified he remained in the position of cover with Cederquist and Pratt while waiting for the SWAT team to arrive. During this approximate one-hour time period, he heard numerous bursts of gunfire, which sounded like two different guns. Tallmon was able to see muzzle flashes as Maravilla fired. He saw about three to six muzzle flashes, coming from outside the residence, were there were trailers and a carport, and not from the same location. Based on the sounds of shots fired in his direction and objects being struck by projectiles behind him, Tallmon believed Maravilla was shooting at him and the other officers. He did not think that any officers fired their weapons after the point when he arrived at the scene.

Jeremy Smith, a Madera police officer, was dispatched to the scene and heard multiple gunshots after parking and exiting his vehicle. He continued to hear gunshots after taking cover, which sounded like they were coming from the residence.

Josh Gibbs, a detective with Madera Police Department, arrived with his lights and sirens activated. He recalled seeing other law enforcement vehicles with their red and blue emergency lights activated. After taking cover, he remained in place for about two hours waiting for the SWAT team, during which time he heard approximately 100 gunshots, which varied in caliber based on the sound. Gibbs believed the shots were coming from the residence and that the shooter changed locations. He did not see muzzle flashes but heard the whistle of bullets traveling past and heard the bullets ricochet. Gibbs believed the shots were fired in his direction based on the sound of the gunfire and the ricochets.

Richard Gutierrez was a detective corporal for the Madera County Sheriff's Office and part of the SWAT team dispatched to the scene. Gutierrez retrieved several officers

9.

who were taking cover in front of the residence, using an armored vehicle to pick them up. Officers Gibbs testified the gunshots continued while the armored vehicle was extracting them. Officers Romo and O'Neal did not hear any gunshots while in the armored vehicle. Officer Cederquist could not recall if he heard any more shots once he was in or near the armored vehicle. Tallmon said that as soon as SWAT showed up with an armored vehicle, the gunshots stopped or nearly stopped. It took about an hour for Gutierrez to retrieve all of the officers. Then Gutierrez took a position in front of the residence, with a full view of the front door. Gutierrez remained in that position for about two hours. He did not hear any gunshots during that time.

A SWAT team in another armored vehicle was used to apprehend the suspect. SWAT fired several rounds of an irritant gas into the residence.

Logan Majeski was a deputy sheriff and canine handler who was dispatched to the scene around 9:30 p.m. When he arrived, the scene was still active and he could hear gunshots. Around two o'clock in the morning, Majeski was told to take his canine to a lean-to garage near the residence in an attempt to take Maravilla into custody. Majeski approached the garage with his canine on a leash and saw Maravilla lying facedown on the ground in the garage, communicating with officers. Maravilla refused to come out despite repeated commands. Majeski eventually gave his canine the command to bite in an effort to extract Maravilla from the garage. The canine bit Maravilla on his left forearm and after further discussion, Maravilla crawled out of the garage and was taken into custody.

Maravilla was unarmed at the time of his arrest. He said he did not know why his wife would do this to him.

John Grayson, a deputy sheriff with the Madera County Sheriff's Office, testified as an expert in firearms. Grayson reviewed the dash cam footage from Pace's vehicle and opined there were at least two and possibly three shots fired at Pace.

10.

Daniella Romero, a crime scene specialist with the Madera County Sheriff's Office, testified regarding evidence marked at the scene. She observed two long guns she believed to be shotguns leaned against a bush near the residence. She observed ammunition on the ground near the long guns. There were several shell casings and live ammunition scattered around towards the front of the residence. Towards the rear of the residence, Romero observed a .45 caliber handgun and a magazine with .45 caliber rounds. Romero found a lot of spent shell casings throughout the exterior of the property, ranging from .40 caliber shell casings, .45 caliber, and .22 caliber shell casings. More spent shell casings were found inside the residence, as well as live ammunition. Inside, a .17 caliber Savage bolt action rifle was found on a couch, along with more live ammunition. In the master bedroom, Romero found a .22 caliber rifle and a handgun on the bed, along with live ammunition. She found extensive bullet damage to Sergeant Pace's vehicle and bullet damage to a Madera Police vehicle. She did not find bullet damage to any other vehicles.

**Verdict and Sentencing**

Maravilla was charged with attempted murder of a peace officer (§§ 187, subd. (a), 664; count 1 [Sergeant Eric Pace]); attempted murder of Mayra Aragon (§§ 187, subd. (a), 664; count 2); making criminal threats (§ 422, subd. (a); count 3); nine counts of assault on a peace officer with a firearm (§ 245, subd. (d)(1)) as follows: count 4 [Deputy E. O'Neal], count 5 [Sergeant J. Tallmon], count 6 [Deputy M. Plascencia], count 7 [Officer J. Gibbs], count 8 [Officer T. Cortez], count 9 [Officer J. Smith], count 10 [Deputy B. Cederquist], count 11 [Sergeant L. Pratt], count 12 [Officer J. Romo]; one count of assault with a firearm (count 13; § 245, subd. (a)(2) [C. Plascensia]); and one count of shooting at an inhabited dwelling (count 14; § 246).

It was alleged as to counts 1 and 2 that Maravilla's actions were willful, deliberate and premeditated (§ 664, subd. (a)), that he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), that he personally and

11.

intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)).

As to count 3, it was alleged that Maravilla personally used a firearm (§ 12022.5). As to counts 4, 5, 6, 7, 8, 9, 10, 11, and 12, it was alleged that Maravilla personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and that he personally used a firearm (§ 12022.53, subd. (b)). As to count 13, it was alleged that Maravilla personally used a firearm (§ 12022.5, subd. (a)).

The following aggravating factors were alleged as to all counts: that Maravilla acted with great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (California Rules of Court, rule 4.421(a)(1)[2]); that he was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)); and that he engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(2)).

The jury found Maravilla not guilty of count 2 as charged, but guilty of the lesser included offense of attempted voluntary manslaughter and found true the allegation as to count 2 that he personally used a firearm (§ 12022.5, subd. (a)). The jury found Maravilla guilty as charged on the remaining counts and found true the firearms enhancements and premeditation/deliberation allegations.

In a bifurcated proceeding, on July 13, 2023, the trial court found true the aggravating factors.

On November 20, 2023, the trial court declined Maravilla's request for concurrent sentencing and declined to strike any enhancements. The court sentenced him to a total determinate term of 105 years eight months, and a total indeterminate term of 40 years to life, with 2,110 days credit for time in custody, and imposed various fines and fees.

Maravilla filed a timely notice of appeal.

---

[2] Undesignated references to rules are to the California Rules of Court.

## DISCUSSION

**The Trial Court Did Not Err Since There Was No Substantial Evidence to Support an Imperfect Self-Defense Instruction.**

Maravilla contends the trial court erred when it declined to instruct the jury on imperfect self-defense as to count 1. He contends the instruction was supported by substantial evidence and went to the heart of the defense as to count 1, which deprived him of his right to present a defense and to due process of law. The People disagree, contending there was no substantial evidence to support an imperfect self-defense instruction. We conclude there was no substantial evidence to support an imperfect self-defense instruction.

### Relevant Factual and Procedural History

Maravilla requested instruction on imperfect self-defense on count 1, giving the following reasons:

> "The testimony was that my client's wife called the – called 911 regarding a domestic assault occurred committed by my client to her. Moreover, a threat attributing to my client regarding, I'm going to kill the first officer that shows up – or its variance – and the last bullet will be for you. Sergeant Pace responds to the scene, and there's video of it. He testified that he got out of his vehicle, saw [Maravilla] smiling with his hands up. And according to his live testimony, he said that my client put a hand down. He may or may not have said, no, and he turned. And I asked him as kind of a – like the wild west? Like a drawing they drew their weapons. And his opinion was that my client, I think he said, shot first. Shots are – shots are hitting the ground. And according to witnesses, the evidence presented by the People was that two or three hit the ground in front of Sergeant Pace, and then one hit him in the leg. Moreover, there was testimony that Sergeant Pace fired his gun two times and that those – those bullets, according to witnesses, ended up on the facade of my client's [residence]. I believe it is in contention of whether, in fact, my client or Sergeant Pace fired first, primarily.

> "Number two, I think it's – I plan on arguing that my client very well could have pulled his – shot his weapon as Sergeant Pace raised his or tried – attempted to shoot his, just as Sergeant Pace testifies. If – moreover, I

13.

don't really care too much about tipping my hand and my arguments in closing. I think that there is ample evidence to suggest that my client very well, upon Sergeant Pace's arrival to the scene, thought he was … a law enforcement officer because of perhaps hearing – anyways, thought it was a law enforcement officer, but with a spotlight and a flashlight shining in his face and no police lights on, nor no announcing – identifying law enforcement, that at that moment, my client either was unsure if this was a police officer or not, and perhaps unjustifiably, imperfectly felt he had a right to defend himself. And I think that those arguments, under the circumstance, are reasonable if they – [the prosecutor] brought my client's wife to testify that it was clear it was officers, but her descriptions of the circumstances, the vehicle, uniform, she was – she couldn't answer. It took about 20 to 30 minutes to kind of narrow it down. But, more importantly, she was told, according to evidence presented by [the prosecutor], that law enforcement was there.

"And I believe, and I apologize to everybody if this is incorrect, but certainly other witnesses, if not Sergeant Pace, testified that the purpose in shining their light, and stuff like that, is to hide – is to hide where they are, and stuff like that. So I don't think that, under these circumstances, it's unreasonable to say that at the moment he fired his weapon, that he thought his life was in danger. And, moreover, information and evidence presented regarding after the fact bolstered that. There's no – Sergeant Pace was never ever – there's not even an argument that he was shot at or ever attempted to hurt afterwards. And anyways, that's why I feel that that instruction is justified."

The prosecutor responded:

"Your Honor, I don't think there's any testimony that [Maravilla] believed him or anybody else was in danger of being killed or suffering great bodily injury. Even – I mean, I don't know what evidence even remotely supports that and – or even [Maravilla] believed that the use of deadly force was necessary to defend against the danger. The statute requires the defendant actually have that belief that there was imminent danger for yourself or someone else, and there's no testimony whatsoever to support that. I don't think this is even – should be given as an instruction as to Count 1. I mean, even in the video it's clear he came out with his hands up. In the video, I know it's going back, but you can see him reaching towards his back prior to Sergeant Pace even blocking the camera prior to his drawing his weapon.

"And as far as the argument that he didn't continue to fire at Sergeant Pace, based on the video, that's because Sergeant Pace took cover and he pointed

14.

his weapon and, what I believe the evidence to show, that he clearly fired bullets and chased after his wife, who was running in a different direction. I just don't see how the evidence would support that he actually believed that somebody's life was in danger, his or his wife's."

Defense counsel responded that he was not asking for defense of his wife. He argued "there's not one ounce of evidence there to show us who shot first. That's not even dispositive; it's whether or not my client felt that his life was in danger." Defense counsel argued there is evidence to support that Maravilla never threatened the police or his wife, and that "according to Pace, they both reached, and he said that my client hit and he didn't."

The prosecutor responded:

"The only thing I'll go on to say is the video shows Sergeant Pace coming to the house. It shows [Maravilla] with his arms up. Sergeant Pace took no action towards his weapon. He was not holding his weapon at any time prior to [Maravilla's] hand reaching down to his side and slightly behind his back. It's only at that time that you see Sergeant Pace taking any action towards [Maravilla]. He didn't show up with his gun drawn. He testified, which is evidence, that [Maravilla] drew first and shot first, and that he was too late and that's why he got shot. Based on the evidence that's presented, there's no indication that he actually was in fear for his own life or the life of somebody else. I just don't see it, Your Honor."

Defense counsel added:

 "[T]here was testimony impeaching Sergeant Pace about his message over the radio saying that my client – that he – or it's clear on the impeachment that Sergeant Pace had time to tell on the radio that my client had both hands in his pocket. And in the video, my client is obscured during the shooting and – and I'm arguing that it's not clear who shot first at all. And the threshold, Your Honor, is just to merit consideration by the jury…and the duty."

The trial court explained:

"For the argument of substantial evidence as for lesser included for an imperfect self-defense, it's not for the Court to weigh the evidence or its credibility, but to see if there is substantial evidence from which a reasonable jury could have doubted that the defendant was – that there's a theory to support that. And so if there's a reasonable probability that at least

one juror would have – could vote for the lesser included for an imperfect self-defense, that's enough substantial evidence, I think, for the Court to instruct on it. That's really not for the Court to weigh the credibility of that evidence, but if there's substantial evidence to support at least one juror considering it and voting that way, that's substantial enough for the Court."

Ultimately, the trial court ruled there was not substantial evidence to support an imperfect self-defense instruction. The court explained:

"Upon review of the Court's notes and review of the arguments, the Court feels that there's no substantial evidence to support an imperfect self-defense instruction. The testimony that was given by [Aragon] was that [Maravilla] did draw first. [Maravilla] shot the gun. And the further testimony given by Sergeant Pace was that he did not have his gun drawn first, it was [Maravilla], and that [Maravilla] shot. [Maravilla] fired multiple shots, and then [Maravilla] – one of those shots hit Sergeant Pace.

"Further, the Court looked at the testimony from Sergeant Pace, that the officer did receive the information that someone was threatening to shoot whoever came to the door. And to the extent that Sergeant Pace may have had a heightened awareness of when he approached the door, even if, based on the argument counsel had purported, which there really isn't any evidence to support, but more speculation that even if Sergeant Pace did have his hand on his gun, officers can approach, even traffic stops, with their hand on their weapon if there's furtive movement, or they have cause to believe there could be immediate danger, which is the case here, based on the evidence that was admitted through testimony both of the 911 call that [Aragon] made, and then the information that Sergeant Pace received at the time that he approached the home.

"And the next argument that the Court had looked at was whether or not it was light enough for [Maravilla]. The testimony was by Sergeant Pace that he had a spotlight on. Sergeant Pace, you could clearly see in the video, was in full uniform, was in a fully marked patrol vehicle. And there was no testimony that Sergeant Pace shined a flashlight into [Maravilla's] eyes where [he] couldn't see. That's speculation. There's no evidence to support that. And you could clearly see on the video that Sergeant Pace is there in a fully marked uniform, and as he approaches, [Aragon] is standing outside. You can see [Maravilla] coming out on the video with his hands up and then drawing for the gun. So there just is no indication that [Maravilla] was working in or acting under the guise of self-defense, either for himself – unless Sergeant Pace said, 'Hey, I'm going to come out and shoot you first before I arrest you,' which, obviously, there's no indication

16.

of that, or that [Aragon], herself, was in danger and he was in defense of someone else. As a matter of fact, the testimony was that [Maravilla] was going to shoot whoever came to the door.

"So in light of those – the evidence that came in, the Court doesn't feel that there's substantial evidence to support the instruction for imperfect self-defense, so the Court will not be giving that instruction."

**Standard of Review**

A trial court's decision whether or not to give an instruction is reviewed de novo. (*People v. Simon* (2016) 1 Cal.5th 98, 133 (*Simon*) [trial court's decision whether to give imperfect self-defense instruction reviewed de novo]; *People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*) [same]; *People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*) [failure to give instruction on uncharged lesser included offense reviewed de novo].) "Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568, citing *Waidla,* at p. 733.) "As such, it should be examined without deference." (*Waidla*, at p. 733.)

**Applicable Law**

"A trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged" only if there is substantial evidence " ' "which, if accepted …, would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*[.]' " (*Waidla, supra,* 22 Cal.4th at p. 733.) A court is not obligated to instruct on a lesser included offense unless there is substantial evidence. (*Manriquez*, *supra*, 37 Cal.4th at p. 588.)

Substantial evidence is " 'evidence from which a rational trier of fact could find beyond a reasonable doubt.' " (*Manriquez*, *supra*, 37 Cal.4th at pp. 587–588; accord, *People v. Mendoza* (2000) 24 Cal.4th 130, 174, superseded by statute on other grounds as explained in *People v. Brooks* (2017) 3 Cal.5th 1, 62-63, fn. 8 [same]; see also *People v.*

17.

*Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*) ["Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive' "].)  Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.  (*Mendoza*, at p. 174; see also *Barton,* at p. 201 [no need to give an instruction when the evidence is "minimal and insubstantial".)

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death."  (*Simon, supra,* 1 Cal.5th at p. 132; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1226 (*Rangel*); *Manriquez*, *supra*, 37 Cal.4th at p. 581.)  Imperfect self-defense is not considered a true affirmative defense but "is instead a shorthand way of describing one form of voluntary manslaughter."  (*Simon,* at p. 132; see *Barton*, *supra*, 12 Cal.4th at pp. 199-201.) "Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder."  (*Simon*, at p. 132; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 [same].)  Thus, the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter.  (*Simon*, at p. 132; *Manriquez*, at p. 581.)

" '[T]he doctrine is narrow.  It requires without exception that the defendant must have had an *actual* belief in the need for self-defense.  We also emphasize what should be obvious.  Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.  " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril*

18.

*is one that, from appearances, must be instantly dealt with.*' " ... [¶] ... [W]e reiterate that, just as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*" ' " (*Manriquez*, *supra*, 37 Cal.4th at p. 581; accord, *In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*).)

"This doctrine may not, however, be invoked 'by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.... For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense.' " (*Rangel*, *supra*, 62 Cal.4th at p. 1226; accord, *Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

**Analysis**

Here, the record is devoid of evidence Maravilla had an actual belief he was in imminent danger, or was unaware Sergeant Pace was a police officer, or that he needed to act in self-defense. (See *Manriquez*, *supra*, 37 Cal.4th at p. 581.)

First, there is no evidence to support Maravilla's claim he did not necessarily know Sergeant Pace was a police officer. Evidence shows Maravilla's wife, Aragon, called the police after a domestic violence incident where Maravilla was the aggressor. While she was on the phone with 911, Maravilla threatened to shoot the police when they arrived, and to save a bullet to shoot his wife. This evidence clearly demonstrates Maravilla was aware police had been called and were on their way to his residence. Aragon stayed on the phone with the police while waiting for them to arrive, further demonstrating Maravilla would have been aware police were on their way.

Aragon testified Sergeant Pace arrived in a marked police vehicle with his lights activated and wearing an official police uniform. The fact Pace did not have his siren activated does not detract from the overwhelming evidence Pace was law enforcement

19.

responding to Aragon's call.  Maravilla then followed Aragon as she walked over to speak with the police officer.  Maravilla demonstrated he was aware Pace was a police officer by approaching with his hands up in the air.

There is also no evidence that Maravilla felt he was in immediate danger from Pace.  Rather, the evidence only shows Maravilla as the aggressor.  He made a plan to shoot the police before they arrived and then followed through with his plan by actually shooting the police.  Even though Pace was notified through dispatch the suspect indicated he was going to shoot the police, Pace did not approach the residence with his weapon drawn.  Rather, Pace observed Maravilla with his hands in the air and responded by asking, what is the problem.  That was when Maravilla put his hand down, grabbed his gun and began shooting at Pace.  Evidence shows Pace was still quite a distance from Maravilla at this point and not posing any physical threat.  There is no evidence that Pace reached for his own weapon first.  Rather, it was only after Maravilla reached for his own gun that Pace reached for his.  And only after Maravilla shot Pace in the leg did Pace fired back at Maravilla.  Moreover, evidence that Maravilla smiled before reaching for his gun further negates any claim he felt in actual danger.

Imperfect self-defense does not apply to situations like this, where the defendant created the circumstances leading to the attack.  (See *Rangel*, *supra*, 62 Cal.4th at p. 1226.)  In *Rangel*, our Supreme Court concluded the defendant could not rely on unreasonable self-defense where the defendant and his son, who were armed, broke into the victim's home, and then shot the victim when the victim rushed into the living room because defendant thought he was getting a gun.  (*Rangel*, at p. 1226.)  The court concluded the defendant was the initial aggressor and the victim's response was legally justified.  Here as well, Maravilla was the initial aggressor when he squeezed his wife's neck, causing her to call the police to come to the residence.  He cannot claim imperfect self-defense when the police lawfully arrived responding to a call for help from his wife.  Maravilla was again the initial aggressor when he reached for his firearm first and shot

Pace. He cannot claim imperfect self-defense when the police lawfully began investigating the reason for the wife's call, especially here when the evidence shows Pace approached without any weapon drawn.

Maravilla's arguments are unpersuasive and not supported by any evidence. He argues the evidence was not overwhelming that he knew Pace was a police officer, noting the vehicle did not have its siren on and that Pace did not announce "I am a police officer." Maravilla also argues there were issues with visibility, such as the lack of street lights, that Pace may have had his spotlight on, was using a flashlight, and that his vehicle headlights were illuminating the residence. However, none of these arguments refute the overwhelming evidence that Maravilla was the initial aggressor, was clearly aware the police were on their way, and knew Pace was law enforcement as shown by approaching with his hands in the air.

On this record, the evidence was clearly insufficient to require the giving of Maravilla's requested instruction regarding imperfect self-defense. We therefore conclude the trial court did not err in refusing to instruct the jury on imperfect self-defense.

## Trial Court Applied An Incorrect Standard Under Section 1385

Maravilla contends the trial court erred when it declined to strike his firearm enhancement without applying the proper analysis under section 1385, subdivision (c). The People concede that in light of recent case law, the trial court did not apply the correct legal standard under section 1385, subdivision (c) and that remand is warranted. We agree and remand the matter only for the court to conduct the proper analysis under section 1385, subdivision (c).

### Relevant Procedural History

Prior to sentencing, both parties filed sentencing statements. On July 7, 2023, the People filed a brief requesting that the court find true the three factors in aggravation alleged in the second amended information: first, that Maravilla acted with great

violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); second, that he was armed with or used a weapon at the time of the offense (rule 4.421(a)(2)); and third, that he has engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)).  The court found all three aggravating factors to be true following a court trial on July 13, 2023.

On November 2, 2023, Maravilla filed a statement in mitigation, in which he requested concurrent sentencing for each count and special allegation.  He argued that the offenses constituted a "singular criminal objective" during an indivisible course of conduct, which was to "deter the officers who had been dispatched in his home address." He argued that he "engaged in a single, continuous act of violence" which was committed at the same location on the same day within a short time.  He urged the court to consider he had "essentially no criminal history" other than one Vehicle Code offense and one juvenile matter and noted his completion of multiple anger management, domestic violence, and substance abuse programs during his pre-sentence incarceration.  The statement in mitigation did not ask for dismissal of the enhancements under section 1385.

On November 8, 2023, the People filed a response to the statement in mitigation, asking that the court sentence Maravilla consecutively to each count and enhancement. The probation report found no factors in mitigation.  It recommended a determinate term of 105 years and eight months, including an aggravated term of 8 years on count 4, deemed as the principal term, and consecutive sentences on other counts and enhancements.  The report further recommended an indeterminate term of 40 years to life, which included 15 years to life on count 1 and 25 years to life for the section 12022.53, subdivision (d) enhancement.

At the sentencing hearing on November 20, 2023, the trial court stated it had read and considered Maravilla's motion and statements in mitigation and found some factors in mitigation because of his lack of criminal history.  It found section 654 was not

22.

applicable because there were multiple victims. The court also noted that the shooting took place over a number of hours, with over 100 rounds shot, giving ample time in between reloading or changing weapons to consider his actions and to stop, which he chose not to do.

Defense counsel agreed that "the multiple victim exception is pretty clearly laid out in terms of the applicability of [section] 654" but asked for concurrent sentences on counts 4 through 14 based on Maravilla's lack of criminal history, arguing that this was aberrant behavior over a single period of time. He further asked the court to exercise its discretion under section 1385 to strike some or all of the enhancements, "most of which involve the same firearm, the same allegation that the offenses were committed with a firearm." As a secondary request, defense counsel argued section 1385, subdivision (c)'s provision that the court shall dismiss any enhancements that go over 20 years was a factor the court should weigh heavily in determining whether to impose all the additional enhancements.

The prosecutor asked for consecutive sentences under rule 4.425(a)(2) on the basis the crimes involved separate acts of violence or threats of violence, with multiple people put at risk. The prosecutor noted the multiple firearms found in the home, indicating there was criminal sophistication and planning. The prosecutor also noted Maravilla putting the officer "off his guard" by putting his hands up before drawing a firearm, and that it took a canine unit in order to apprehend him.

The trial court stated it was not inclined to run counts 4 through 14 concurrently as they were independent, with separate victims. Maravilla continued to open fire on several officers. Civilians nearby were also placed in the line of fire. The court stated it was "rather surprised that no one other than Sergeant Pace was hurt." The court agreed with Maravilla that he did not plan this, and "it started when Sergeant Pace arrived and that set the series of events into actions. That he didn't take the opportunity to stop after several hours, that's what I'm concerned about. That's why I don't think things should be

run concurrent, certainly not on the charges. The enhancements, it's noted dual use because they are Penal Code Section 245, 245(a)(1), 245(d)(1), with use of the weapon, and then the enhancements, but the enhancements are there for a reason, because if you fire, then the enhancements come into place, which [Maravilla] continued to fire repeatedly over a 100 rounds, but those are all separate and independent in the Court's mind when you have officers coming and going, different officers, different vehicles pulling in, pulling out, emergency personnel responding, and [Maravilla] just continues – continues to shoot and open fire regardless of where it's going to go, and it hits the neighbor's house.  He's very lucky" that no one was killed.  The court acknowledged that it may have been aberrant behavior for defendant and that he did not have any prior criminal history, but the conduct took place over a long period of time, giving him "ample opportunity to stop or to surrender or to change course, none of which he did until the canine was released[.]"  For these reasons the court was not inclined to run the enhancements concurrently or strike any of them.

**Applicable Law**

On January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) went into effect, amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

Section 1385, subdivision (c), in pertinent part, provides: "(c)(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so[.]"  Subdivision (c)(2) states, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that

24.

the dismissal of the enhancement would result in physical injury or other serious danger to others." (See *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 227 (*Gonzalez*).) Section 1385, subdivision (c)(2) " 'does not require the trial court to consider any *particular* factors in determining whether "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." ' " (*Gonzalez,* at p. 227; accord, *People v. Mendoza* (2023) 88 Cal.App.5th 287, 299 (*Mendoza*).)

> Mitigating factors the court shall consider under section 1385 include:

> "Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

> "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).)

> "[A]bsent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present. [Citation.] In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1029 (*Walker*).)

Accordingly, a trial court's finding that dismissal of enhancements would endanger public safety relieves the trial court of its obligation to consider any of the mitigating circumstances listed in subdivision (c)(2) of section 1385. (*Mendoza, supra,* 88 Cal.App.5th at pp. 296-297.) In determining whether dismissal of the enhancement would endanger public safety, the court cannot solely "focus on whether the defendant *currently* poses a danger." (*Gonzalez, supra,* 103 Cal.App.5th at p. 228.) "Although the

25.

current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence." (*Ibid.*)

A trial court's decision not to dismiss an enhancement pursuant to section 1385, subdivision (c) is reviewed for abuse of discretion. (*Mendoza, supra,* 88 Cal.App.5th at p. 298; *Gonzalez, supra*, 103 Cal.App.5th at p. 225 [court applies the abuse of discretion standard of review to trial court's decision on whether dismissal of an enhancement would endanger public safety]; *People v. Shaw* (2020) 56 Cal.App.5th 582, 586 [A trial court's denial of a request to strike an enhancement is reviewed for abuse of discretion].) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) A court abuses its discretion where it considers improper factors in making a sentencing decision, or conversely, where it fails to consider relevant factors. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140-1141; see *People v. Knoller* (2007) 41 Cal.4th 139, 156 [impermissible factors or on an incorrect legal standard].) "When being sentenced, a defendant is entitled to decisions made by a court exercising informed discretion. [Citation.] A court acting while unaware of the scope of its discretion is understood to have abused it." (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

**Analysis**

Here, both parties agree that the trial court did not rely on the applicable standard in exercising its discretion not to dismiss enhancements under section 1385, subdivision (c) and agree the matter should be remanded to the trial court to exercise its discretion under section 1385, subdivision (c)(2).

A trial court's finding that dismissal of enhancements would endanger public safety relieves the trial court of its obligation to consider any of the mitigating circumstances listed in subdivision (c)(2) of section 1385. (*Mendoza*, *supra*,

26.

88 Cal.App.5th at pp. 296-297.)  In determining whether dismissal of the enhancement would endanger public safety, the court cannot solely "focus on whether the defendant *currently* poses a danger."  (*Gonzalez*, *supra*, 103 Cal.App.5th at p. 228.)  In *Gonzalez*, the defendant asked the trial court to exercise its discretion and dismiss the prior serious felony and firearm enhancements, which would lower the defendant's indeterminate sentence from 75 years to life to 50 years to life.  (*Id*. at pp. 220, 222.)  The trial court denied the defendant's request, finding that he currently posed a risk to public safety.  (*Id*. at p. 224.)  On appeal, the defendant claimed that the trial court erred in focusing on whether he "presently" and "currently" endangered public safety rather than assessing whether, looking forward, public safety would be endangered due to an earlier release from prison if the enhancement was dismissed.  (*Ibid*.)  The appellate court agreed and found the court abused its discretion when it failed to consider whether dismissing the enhancement would cause a future danger to public safety.  (*Id*. at pp. 230-231.)  In so holding, the court clarified "[a]lthough the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence."  (*Id*. at p. 228.)

Here, Maravilla contends the mitigating factors under section 1385, subdivisions (c)(2)(B) and (c)(2)(C) were applicable to his case and that the trial court erred by not considering whether dismissal of the enhancement would endanger public safety.  The People agree that subdivision (c)(2)(B) was arguably applicable and that the "court was required to consider whether … dismissal of the enhancement would endanger the public safety, and, if not, whether significant countervailing factors existed such that dismissal of the enhancements was not in the interest of justice."

Significantly, Maravilla's sentencing took place on November 20, 2023, before the decisions in *Walker* and *Gonzalez* had been issued.  In conducting its very thorough sentencing hearing, the trial court simply did not have the benefit of those decisions.

27.

Instead, the trial court declined to strike the firearm enhancements or run any of them concurrent based on the dangerousness of the offense, stating, "the enhancements are there for a reason, because if you fire, then the enhancements come into place, which [Maravilla] continued to fire repeatedly over a 100 rounds[.]" The court did not consider the "crucial part of the inquiry" which "is how the dismissal of the enhancement will impact the length of the defendant's sentence." (See *Gonzalez*, *supra*, 103 Cal.App.5th at p. 228.)

Because the court applied what is now an improper standard under *Walker* and *Gonzalez* in evaluating Maravilla's request to strike the enhancements under section 1385, subdivision (c), we cannot presume the trial court knew the standards articulated by those cases. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [trial court presumed to have been aware of and followed applicable law]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1092 [presumption does not apply where the sentencing law is not yet established].) In such circumstances, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicates[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (See *People v. Salazar* (2023) 15 Cal.5th 416, 424 (*Salazar*); accord, *People v. Gonzalez* (2014) 58 Cal.4th 1354, 1391; *Gonzalez*, *supra*, 103 Cal.App.5th at p. 231.)

Here, the record does not clearly indicate whether the trial court would still have chosen not to dismiss the enhancements under section 1385 had it considered whether dismissal would cause a future danger to public safety as articulated in *Walker* and *Gonzalez*. Maravilla was 44 years old at the time of sentencing and received a total determinate term of 105 years eight months, and a total indeterminate term of 40 years to life. Nothing in the record "clearly indicate[s]" whether the trial court would have chosen to dismiss any enhancements under section 1385 under *Gonzalez*, especially given Maravilla's age at the time of sentencing and the length of defendant's sentence. (See *Salazar, supra,* 15 Cal.5th at p. 424.) Accordingly, we must remand the matter to allow

28.

the trial court to resentence Maravilla under section 1385 applying the standards set forth in *Walker* and *Gonzalez.* We express no view as to how the court should exercise its discretion.

## DISPOSITION

We reverse the judgment and remand the matter for a new sentencing hearing for the trial court to consider whether to strike enhancements under section 1385, subdivision (c), applying the standards articulated in *Walker* and *Gonzalez.* In all other respects, the judgment is affirmed.


FAIN, J.*

WE CONCUR:


HILL, P. J.


LEVY, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.